**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GILBERTO MELENDEZ, | CASE NO. 4:13-cv-02969-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 4, 5, 12, 14, 15 |

## REPORT AND RECOMMENDATION

### I. Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Gilberto Melendez for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). First, Plaintiff appears ineligible to receive benefits under this application due to a combination of parole violations and incarceration. An ALJ awarded Plaintiff benefits in 2007, but the Commissioner terminated those benefits in 2009 after he was incarcerated for twelve continuous months. He was paroled in August of 2010 and applied for benefits in December of 2010. Plaintiff became eligible for benefits on January 1, 2011, the first month after his SSI application. However, he disqualified himself from benefits in January of 2011 by violating parole on January 27, 2011. Upon his

incarceration, any eligibility for benefits was suspended as of February 1, 2011, and remained suspended through March 1, 2012, when eligibility for benefits was again terminated. Thus, he was ineligible in December of 2010 or any month prior because he filed his application in December of 2010, he was ineligible in January of 2011 because he violated parole during January of 2011, and he was ineligible in February of 2011 and every month after because he was incarcerated. Plaintiff's ineligibility for benefits renders his disability moot. However, even if Plaintiff had been eligible for benefits, the Court would recommend affirming the ALJ decision, so the Court will review the relevant medical and non-medical evidence.

Plaintiff rarely mentioned mental symptoms and was treated only with a stable dose of Remeron. He was assigned global assessment of functioning ("GAF") scores that ranged from 55 to 70. A state agency psychiatrist reviewed Plaintiff's file and opined that his mental impairments caused no more than minimal limitations. In terms of physical impairments, the only objective evidence provided by Plaintiff during the relevant period shows varicose veins and limited range of motion in his left shoulder. The ALJ limited Plaintiff to light work with only occasional reaching with his left shoulder, and Plaintiff has not identified why this limitation is insufficient. Treating providers specifically indicated that Plaintiff was manipulating them in an attempt to receive a bottom bunk. Plaintiff bears the burden of producing medical evidence, and the statute does not except incarcerated

claimants from this burden. Plaintiff did not submit any medical records whatsoever from March 2011 through the date of the ALJ decision in August of 2012. For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On December 21, 2010, Plaintiff filed an application for SSI under the Act. (Tr. 117-22). On March 25, 2011, the Bureau of Disability Determination denied this application, (Tr. 58-69) and Plaintiff filed a request for a hearing on April 28, 2011. (Tr. 70-72). On August 21, 2012, an ALJ held a hearing at which Plaintiff— who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 24-51). On August 27, 2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 7-23). On September 4, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 6), which the Appeals denied on October 16, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On December 10, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On April 25, 2014, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 4, 5). On June 10, 2014, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc. 12). On July 11, 2014, Defendant filed a brief in

response ("Def. Brief"). (Doc. 14). On August 8, 2014, Plaintiff filed a brief in reply. ("Pl. Reply"). On November 5, 2014, the case was referred to the undersigned Magistrate Judge.

## III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also

determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four. If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

Specifically, the Act provides that:

An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("In making determinations with respect to disability under [the SSI] subchapter, the provisions

of sections 421(h), 421(k), and 423(d)(5) shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter").

## V. Facts in the Record Relevant to Plaintiff's Eligibility

On May 23, 2007, Plaintiff was adjudicated disabled under a previous application. (Tr. 10). He was incarcerated at that time. (Tr. 37). He was paroled in January of 2008. (Tr. 37, 295). He violated parole and was incarcerated again in June of 2008. (Tr. 182, 186). He remained incarcerated for more than twelve months, so his eligibility for disability under the prior application terminate. (Tr. 203); 20 C.F.R. § 416.1325(a) ("Except as provided in § 416.211 (b) and (c), a recipient is ineligible for benefits for the first full calendar month in which he or she is a resident of a public institution (as defined in § 416.201) throughout the calendar month (as defined in § 416.211(a)), and payments are suspended effective with such first full month. Such ineligibility continues for so long as such individual remains a resident of a public institution."); 20 C.F.R. § 416.201("Public institution means an institution that is operated by or controlled by the Federal government, a State, or a political subdivision of a State such as a city or county."); 20 C.F.R § 416.1335 ("We will terminate your eligibility for benefits following 12 consecutive months of benefit suspension for any reason beginning with the first month you were no longer eligible for regular SSI cash

benefits, federally-administered State supplementation, special SSI cash benefits described in § 416.262, or special SSI eligibility status described in § 416.265.").

Plaintiff was paroled again on August 23, 2010. (Tr. 297). According to Plaintiff, he applied for benefits on December 21, 2010. [1] (Doc. 19). Plaintiff had spent the previous three months in an inpatient rehabilitation facility after a relapse into cocaine abuse. (Tr. 297). Plaintiff became eligible for benefits on January 1, 2011. C.F.R. 416.203(b) ("How we determine your eligibility for SSI benefits. We determine that you are eligible for SSI benefits for a given month if you meet the requirements in § 416.202 in that month. However, you cannot become eligible for payment of SSI benefits until the month after the month in which you first become eligible for SSI benefits."). However, later that month, Plaintiff violated parole. (Doc. 19). Thus, Plaintiff was not eligible for benefits in January of 2011 because:

> No person shall be considered an eligible individual or eligible spouse for purposes of this subchapter with respect to any month if during such month the person is… violating a condition of probation or parole imposed under Federal or State law.

42 U.S.C. § 1382(e)(1)(J)(4)(A).

Plaintiff was incarcerated on January 28, 2011. Doc. 19. Plaintiff has not been released since that date. Doc. 20. Plaintiff's eligibility for benefits was suspended on February 1, 2011. 20 C.F.R. § 416.1325(a) ("Except as provided in §

---

[1] The ALJ found that Plaintiff protectively filed for benefits on August 25, 2010. (Tr. 10). However, both parties agree that Plaintiff filed for benefits on December 21, 2010 and there is nothing in the record to support the ALJ's date. (Doc. 19, 20).

416.211 (b) and (c), a recipient is ineligible for benefits for the first full calendar month in which he or she is a resident of a public institution (as defined in § 416.201) throughout the calendar month (as defined in § 416.211(a)), and payments are suspended effective with such first full month. Such ineligibility continues for so long as such individual remains a resident of a public institution."); 20 C.F.R. § 416.201("Public institution means an institution that is operated by or controlled by the Federal government, a State, or a political subdivision of a State such as a city or county."). Plaintiff's benefits terminated on March 1, 2012, and Plaintiff will have to file a new application for benefits upon his release if he intends to attempt to receive disability. 20 C.F.R § 416.1335 ("We will terminate your eligibility for benefits following 12 consecutive months of benefit suspension for any reason beginning with the first month you were no longer eligible for regular SSI cash benefits, federally-administered State supplementation, special SSI cash benefits described in § 416.262, or special SSI eligibility status described in § 416.265.").

In sum, Plaintiff did not become eligible for benefits until January 1, 2011, the first month after his SSI application. He was not eligible for benefits in January of 2011 because during that month, he violated parole. His eligibility for benefits was suspended in February of 2011 because he was incarcerated. He remained incarcerated for more than twelve months, so his benefits terminated. Thus, it is

unclear whether the Court even has jurisdiction to rule on this application because it does not appear that Plaintiff was eligible for benefits for any month before they terminated. However, even if Plaintiff had been eligible for benefits, the Court would recommend affirming the ALJ decision, so the Court will review the relevant medical and non-medical evidence.

## VI. Facts in the Record Relevant to Plaintiff's Disability

Plaintiff was born on July 23, 1962 and was classified by the Regulations as a younger individual on the date of his application. (Tr. 19). 20 C.F.R. § 404.1563. Plaintiff has a limited education and no past relevant work. (Tr. 19).

On January 22, 2008, Plaintiff was paroled. (Tr. 295). Plaintiff was evaluated for drug and alcohol treatment at Firetree, LTD. Conewago Place ("Firetree") as a condition of parole due to his past heroin and cocaine/crack use. (Tr. 176). He denied any current medical complaints and denied any current medical symptoms. (Tr. 176). He indicated a history of anxiety, depression, insomnia, lower back pain, knee pain, Hepatitis C, tuberculosis, enlarged prostate, and varicose veins. (Tr. 176). He was currently taking amitriptyline for insomnia, fluoxetine for depression, naproxen for pain, and medications for his prostate and asthma. (Tr. 177). He reported insomnia, limited range of motion, and vision limitations. (Tr. 177). On examination, he was alert and oriented, his affect was appropriate, and he had no symptoms of distress. (Tr. 176). He was a smoker, but

had no shortness of breath, abnormal sounds, or wheezing. (Tr. 177). His gait was coordinated, his grip was firm, and he had no tremors. (Tr. 177). Plaintiff was "cooperative during assessment" and was in "stable condition and good health." (Tr. 178). He had "no medical complaints at this time." (Tr. 178).

On June 12, 2008, Plaintiff was incarcerated after violating his parole and had an initial medical screening. (Tr. 182, 186). He had a past history of a positive tuberculosis test. (Tr. 186). His diagnoses included pulmonary disease, Hepatitis C, arthritis, heroin abuse, and asthma. (Tr. 182). He was restricted to using the lower bunk in the cell. (Tr. 182). He indicated that he had been treated at White Deer Run for detoxification from heroin addiction. (Tr. 182). Plaintiff had last used methadone the week before at White Deer Run, and admitted to going through withdrawal from heroin. (Tr. 183, 293). He complained of being sweaty, nauseated, and having a bad headache. (Tr. 293). Plaintiff had needle marks from "shooting up" and symptoms of withdrawal. (Tr. 184). He reported headaches, pounding heart, back pain, hepatitis, tooth or gum problems, arthritis, asthma, swollen joints, painful joints, and night sweats as "past/present problems." (Tr. 183). However, under "physical limitations," Plaintiff was observed to have "none," under deformities, Plaintiff was observed to have "none," and under "ease of movement," Plaintiff was observed to be "normal." (Tr. 184). He used eyeglasses, but no other assistive devices. (Tr. 184). On physical examination,

Plaintiff's head, face, neck, scalp, sinuses, mouth, throat, teeth, eyes, pupils, fundoscopy, lungs, chest, heart, endocrine system, genitalia, extremities, lymph nodes, feet, musculoskeletal system, neurologic system, and mental status were all "normal." (Tr. 185). The assessment indicated that Plaintiff needed a medical referral, but did not need a psychiatric referral, and was medically cleared to be a part of the general inmate population. (Tr. 185). He remained in the infirmary for detoxification. (Tr. 294). On June 13, 2008, he reported feeling "ok" and "better." (Tr. 294). The next day he requested toothpaste and denied nausea and vomiting. (Tr. 294). On June 15, 2008, he was discharged from the infirmary to the "F" block. (Tr. 291). On June 17, 2008, he reported asthma, hepatitis C, and arthritis in his knees, back, and hands. (Tr. 291). He did not report depression or mental impairments. (Tr. 291). He was prescribed Tylenol and albuterol and advised to stop smoking. (Tr. 291).

On August 12, 2008, Plaintiff had an evaluation prior to being transferred from one prison to another. (Tr. 209). Plaintiff indicated that he was single with five children, had been arrested for aggravated assault, and was sentenced to four to twenty years, "maxing out in 2022." (Tr. 209). A psychiatric evaluation indicated Plaintiff's report of problems with anxiety and problems sleeping. (Tr. 209). He denied symptoms of depression, suicidal ideation, homicidal ideations, delusions and hallucinations. (Tr. 210). He indicated that he had used cocaine once

or twice a week and had used intravenous heroin multiple times per day, beginning in April of 2008 while on parole. (Tr. 210). His mental status examination showed that he was alert and oriented with normal motor activity, although he walked with a limp. (Tr. 212). His affect was appropriate, his mood was normal euthymic, and he had no abnormal thought content, ideas of reference, or thought blocking. (Tr. 212). His memory was intact and his insight and judgment were intact but limited. (Tr. 212). His attention and concentration were intact, his intelligence was average, and his fund of knowledge was adequate. (Tr. 213). He was diagnosed with opiate abuse and anxiety, not otherwise specified, and assessed a GAF of 70.[2] (Tr. 213).

On August 13, 2008, Plaintiff was transferred from one prison to another. (Tr. 180). A transfer screening indicates that Plaintiff reported back problems, arthritis of the hands, asthma, depression, anxiety, and Hepatitis C as acute or chronic problems. (Tr. 180). He indicated that his only medication was trazodone. (Tr. 180). He denied any significant mental history and denied a history of drug or

---

[2] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness…The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two… A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships.") (citing *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994).

alcohol abuse. (Tr. 180). On examination, he was neat and appropriate, and under "Complaints," he indicated "none." (Tr. 180). Under "physical disabilities/limitations," he indicated "none." (Tr. 180). He denied shortness of breath and wheezing. (Tr. 180). He indicated that he used eyeglasses, but did not use any other assistive devices. (Tr. 180). He was recommended to receive "routine," but not "immediate," psychiatric and medical follow-up care. (Tr. 180). He was medically cleared for the general inmate population. (Tr. 181). In August of 2008, Plaintiff was prescribed compression stockings for varicose veins and was cleared by the psychiatry department to take Tylenol. (Tr. 289). In September of 2008, Plaintiff was assessed to have poorly controlled asthma and tested for HIV. (Tr. 290). In November of 2008, Plaintiff was evaluated for possible Hepatitis C treatment, and was unsure whether past treatment worked. (Tr. 287).

At visits with psychiatrists while incarcerated on January 9, 2009, April 23, 2009, August 18, 2009, October 3, 2009, January 10, 2010, June 23, 2010, and August 23, 2010, Plaintiff occasionally reported feeling stressed, depressed, or upset, but also repeatedly reported that he was "doing good" and repeatedly reported that he was "doing ok." (Tr. 198-204). At every visit, he was compliant with his medications and had a normal mental status examination. *Id.* Plaintiff's appearance and hygiene were good, he had a broad range of affect, his mood was euthymic, his thought process was goal directed, he had no delusion, suicidal

ideation, homicidal ideation, or perceptual disturbance. *Id.* His judgment and insight were fair. *Id.* On January 9, 2009, he was prescribed 30 milligrams of Remeron per day, and this dosage was continued at every subsequent visit. *Id.*

At visits with the Asthma Clinic while incarcerated on March 4, 2009, September 3, 2009, and March 17, 2010, Plaintiff's asthma was assessed to be either "mild" or "moderate." (Tr. 279, 283, 286).

On May 7, 2009, Plaintiff followed-up for hepatitis C, and "denied any related complaints." (Tr. 284).

On October 13, 2009, Plaintiff was evaluated for varicose veins in his left leg. (Tr. 282). He was observed to have marked varicosities in his left thigh, and was prescribed Johnston compression stockings. (Tr. 282). In April of 2010, Plaintiff was assessed to have and treated for a fungal infection in his toe nails. (Tr. 277).

On June 28, 2010, Plaintiff had a physical evaluation at the Pennsylvania Department of Corrections. (Tr. 192). Hi head, face, neck, scalp, nose, sinuses, mouth, throat, eyes, pupils, fundoscopy, heart, abdomen, endocrine system, genitalia, extremities, lymph nodes, feet, musculoskeletal system, skin, neurologic system, and mental status were all "normal." (Tr. 192). His only problems were dentures, diffuse wheezing, and varicose veins. (Tr. 192). Under remarks, the examiner noted "[h]ealthy male." (Tr. 193).

On December 16, 2010, Plaintiff had an evaluation at Wellspan Behavioral Health. (Tr. 297). Plaintiff had been paroled from prison in August of 2010, but relapsed with cocaine abuse in September of 2010 and was "sent to a 90 day inpatient facility." (Tr. 297). He was released from that facility earlier in the week. (Tr. 297). He was not on any medications at that time. (Tr. 297). Plaintiff "received social security disability payments due to severe degenerative disc disease and chronic pain" but "hope[d] to find part-time work." (Tr. 297). Plaintiff reported a "longstanding history of depression in addition to polysubstance abuse" and "was medicated with Elavil and/or Remeron while incarcerated, but was discharged without medications." (Tr. 297). Plaintiff reported "several vegetative symptoms of depression including sleep disturbance, appetite disturbance, and malaise...feels anxious as well." (Tr. 297). Plaintiff's mental status examination indicated that he was "casually attired" and well-kept. (Tr. 297). His mood was "fair" and his affect was "appropriate to content." (Tr. 297). His speech was "clear, coherent and goal directed on short-answer and open-ended questions." (Tr. 297). He denied hallucinations, did not appear delusional, and denied suicidal and/or homicidal ideation. (Tr. 297). Plaintiff's attention span was "intact" and he "complete[d] serial 1s from 10 and serial 3s from 20 without mistake." (Tr. 297). His "short-term and remote recall [was] intact," he "recall[ed] 3 of 3 objects at 3 minutes and 5 minutes, and recall[ed] presidents correctly to George Bush." (Tr.

297-98). His "abstractions were [average] for socioeducational level." (Tr. 298). Plaintiff was diagnosed with depression, not otherwise specified, and history of polysubstance abuse, assessed a GAF of 55, and prescribed 30 milligrams of Remeron per day. (Tr. 298).

On December 21, 2010, Plaintiff filed an application for benefits by telephone with the state agency. (Tr. 130-32). The state agency interviewer observed no problems hearing, reading, breathing, understanding, concentrating, talking, or answering. (Tr. 131). He alleged disability as a result of "back problems…arthritis…leg problems…bad nerves…asthma… [and] mental health." (Tr. 134).

On December 30, 2010, Plaintiff discussed his claim by telephone with the state agency. (Tr. 322). Plaintiff indicated that he wanted to submit his "papers" from when he applied and was awarded benefits in the past. (Tr. 322). He was informed that the state agency would accept them, "but the most important info[rmation] is going to be his current examinations/testing." (Tr. 322).

On January 7, 2011, Plaintiff submitted a Function Report. (Tr. 140). He reported that his Hepatitis C, back pain and problem with his left leg keep him at home. (Tr. 140). He reported that he could not walk much or stand much, had to sit on his bed to dress, could not bend to bathe, struggled to care for his hair and shave because of arthritis, and had problems using the toilet because his back hurts when

he sits. (Tr. 141). He reported that his parents cooked for him and he needed reminders to take care of his personal needs or take medication. (Tr. 142). He indicated that he could do laundry and ironing. (Tr. 143). He reported that he leaves the house, but only to go to appointments, and that he can drive or shop, but that it is "difficult." (Tr. 143). He indicated that his only interests are watching television and that he can no longer play sports. (Tr. 144). He reported that his "nerves and anxiety attacks" make him isolate himself and does not trust people. (Tr. 145). He reported that he can only walk for five minutes before needing to rest, can only pay attention for a "short time," and does not follow instructions well. (Tr. 145).

By January 31, 2011, Plaintiff had returned to York County Prison. (Tr. 301). A chest X-ray to screen for tuberculosis was normal. (Tr. 301). Plaintiff did not require immediate medical attention. (Tr. 306). Plaintiff stated that he had never used heroin or methadone and had never been prescribed narcotic pain medications. (Tr. 307). He indicated that his only medications were Remeron, which he had taken the night before. (Tr. 307). He reported that he did not use dentures and his gums and teeth were in good condition. (Tr. 307). His "behavior, history, [and] physical appearance" did not "suggest the risk of suicide, assault, or psychiatric condition." (Tr. 308). However, he reported previous hospitalizations for depression. (Tr. 308). He indicated that he deals with being incarcerated

"good." (Tr. 308). He indicated that he would need to see a psychologist or psychiatrist for a history of depression. (Tr. 308). His mood, affect, appearance, perception and thought process were appropriate. (Tr. 308). He reported that he had never used intravenous drugs. (Tr. 309). Plaintiff's intake form indicated that there were no referrals needed for his care and he was released to the general population. (Tr. 309). On February 4, 2011, Plaintiff reported asthma, Hepatitis C, and gastrointestinal problems at night. (Tr. 317). He did not mention depression or mental impairments and was prescribed Zantac and albuterol. (Tr. 318).

On February 7, 2011, Plaintiff had a musculoskeletal evaluation. (Tr. 314). He "state[d] he has twisted disc in back which he is on disability for this" and also complained of varicose veins in his left leg and degenerative joint disease in both knees. (Tr. 314). He characterized his pain as aching and radiating, mostly on his left leg, and indicated that bending makes it worse. (Tr. 314). On examination, he had scarring but no edema. (Tr. 314). On February 8, 2011, Plaintiff had a physical evaluation. (Tr. 311). Plaintiff was in no distress, alert and oriented with appropriate speech. (Tr. 311). Plaintiff complained of pain on his left leg, and varicose veins were observed. (Tr. 312). Plaintiff's gait was within normal limits, but he had decreased range of motion in his left upper extremity and was unable to raise his left arm above his head due to a previous dislocation in his shoulder. (Tr. 312). He complained of bilateral knee arthritis and was "able to bring hands to mid

shin area." (Tr. 312). He was prescribed albuterol, Zantac and ibuprofen. (Tr. 304).

As of March 7, 2011, his medications included Hytrin, Naprosyn, albuterol, and

Zantac. (Tr. 304).

At his March 7, 2011 follow-up, he had no complaints and was compliant

with his medications and symptoms. (Tr. 313). Plaintiff did not mention depression

or other mental impairments. (Tr. 317-18). Plaintiff had been requesting

assignment to a bottom bunk. (Tr. 317). However, his treating provider noted

"does not qualify for bottom bunk" and that he was "drug seeking and trying to

manipulate for bottom bunk first said he needed it for his back and when that

didn't work he said [']well I had vein stripping in my leg very bad['] –

manipulation." (Tr. 317).

On March 24, 2011, Plaintiff sent a letter to the state agency that he was

"incarcerated and…requesting that a medical decision be made based on

information already in file." (Tr. 322). The state agency confirmed that there were

no physicians willing to do a consultative examination at York County Prison. (Tr.

323). Plaintiff did not submit any additional medical records over the next eighteen

months, through the date of the ALJ decision in August of 2012.

On August 21, 2012, Plaintiff remained incarcerated, so he appeared by

video and testified at a hearing before the ALJ. (Tr. 26). He testified that he left

school after eighth grade because of headaches, pain in his left side, concentration,

and a "learning problem for remembering things or doing things." (Tr. 29). He testified that he had worked in factories, but never for more than three months because of "concentration" and "not being able to stay in one space too long." (Tr. 30). He emphasized that he had previously applied for disability, been approved, and did not "know why if [he] was already getting benefit[s] [he] would have to reapply." (Tr. 32). The ALJ explained "that is one of the rules that they have. After a certain period of time in prison or not receiving benefits, we need to reevaluate your entitlement to disability benefits. And so, that's what I'm doing today…" (Tr. 32). He testified that his problems had gotten worse as they get older, and that doctors in prison "don't usually write everything down that we explain or say about our pain or whatever it is." (Tr. 32).

Regarding hepatitis C, he testified that he had received treatment for it but had to stop because of side effects. (Tr. 33). He testified that his depression began "when [he] was in prison that caused [him] to have [bad] nerves." (Tr. 34). He testified that he was being treated for depression and anxiety with Elavil, but it made him drowsy. (Tr. 35). He testified that his varicose veins in his left leg causes pain and that when he does not use a stocking, swelling returns. (Tr. 35). He testified that if he lifted his left shoulder high "it would just give out on [him]." (Tr. 35). He testified that he was right-handed. (Tr. 36). He testified that "one of the disability doctors when [he] first applied diagnosed [him] with [his] spine

twisted down at the bottom somewhere, which causes [him a lot] of pain." (Tr. 36). He reported that his back causes pain when sitting and his varicose veins cause pain when standing. (Tr. 36). He testified that he was incarcerated at the time of his previous award of benefits in 2007. (Tr. 37). He testified that he was released a few months later and lived with his parents. (Tr. 38). He indicated that while out of prison, he needed help driving because of pain in his back from sitting and needed help shopping because of "arthritis in [his] fingers and [his] joints." (Tr. 38). He reported that he had trouble getting along with people because he "isolate[s]." (Tr. 39). He again stated "I used to get benefits and I don't know why I'm just not able to get them again." (Tr. 40).

The ALJ issued the decision on August 27, 2012. (Tr. 7). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. (Tr. 12). At step two, the ALJ found that Plaintiff's hepatitis C, degenerative disc disease, degenerative joint disease, asthma, varicose veins, bilateral knee arthritis, left shoulder dislocation and depression were medically determinable and severe. (Tr. 12). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 12-15). The ALJ found that Plaintiff had the RFC to perform light work, with the opportunity to alternate sitting and standing at will; limited to only occasional reaching with the left upper extremity, pushing and pulling bilaterally with the lower extremities, handling, fingering, and feeling; and

must avoid hazards such as unprotected heights. (Tr. 15). Plaintiff had the RFC to be on task up 90% of the time and could tolerate only occasional changes to the routine work setting. (Tr. 16). At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 19). At step five, the ALJ relied on the vocational expert testimony and found that Plaintiff could perform other work in the national economy. (Tr. 20). Accordingly, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 20).

## VII.    Plaintiff Allegations of Error

### a.    Plaintiff's 2007 award of benefits

Plaintiff makes an argument repeated multiple times throughout the administrative process: that because he was awarded benefits in 2007, he should be awarded benefits again. (Tr. 170-74); Doc. 1. Plaintiff's award of benefits in 2007 is not determinative of his disability now. As discussed above, Congress and the Social Security Administration have determined that once a claimant has been incarcerated for twelve consecutive months, their benefits are terminated and they must reapply. *Supra*. In fact, even if Plaintiff had not been incarcerated, his award of benefits would have been subject to continuing review. 20 C.F.R. § 416.994(a) ("There is a statutory requirement that, if you are entitled to disability benefits, your continued entitlement to such benefits must be reviewed periodically."). Put simply, Plaintiff's award of benefits in 2007 does not mean he was entitled to

benefits forever.

Plaintiff was repeatedly warned that his award of benefits in 2007 was not determinative, and that he needed to submit medical documentation relevant to his current condition. On December 30, 2010, Plaintiff discussed his claim by telephone with the state agency. (Tr. 322). Plaintiff indicated that he wanted to submit his "papers" from when he applied and was awarded benefits in the past. (Tr. 322). He was informed that the state agency would accept them, "but the most important info[rmation] is going to be his current examinations/testing." (Tr. 322). At the hearing in August of 2012, he emphasized that he had previously applied for disability, been approved, and did not "know why if [he] was already getting benefit[s] [he] would have to reapply." (Tr. 32). The ALJ explained "that is one of the rules that they have. After a certain period of time in prison or not receiving benefits, we need to reevaluate your entitlement to disability benefits. And so, that's what I'm doing today…" (Tr. 32). However, as discussed more fully below, Plaintiff submitted almost no medical evidence relevant to his condition after his application in 2010. Plaintiff states that his conditions had become "more pronounced," but there is no evidence from a medical professional that his condition has worsened. Plaintiff is not a doctor, and needed to provide medical evidence of his condition in 2010, 2011, and 2012.

In fact, the limited evidence of Plaintiff's condition in 2007 indicates that his

condition improved since that time. The prior ALJ wrote in May of 2007 that:

> With regard to his physical impairments, his Hepatitis C, degenerative joint disease and left leg varicosities, require ongoing care accompanied with appropriate treatment by multiple medical specialists. As for his mental problems, the claimant's impairments necessitate close psychiatric monitoring and ongoing treatment with numerous psychotropic medications.

> Progress notes reflect that, despite the claimant's treatment, he continues to experience symptoms and limitations of persistent headaches, constant fatigue and chronic pain in his low back, legs and knees. His pain results in trouble sleeping and difficulty concentrating and is exacerbated by activities involving sitting, standing, walking, climbing, lining, carrying, pushing, pulling, bending, stooping, crouching and kneeling, He has periods of depression and anxiety as well as mood swings, crying spells, increased irritability, restlessness, decreased appetite, memory problems and decreased motivation and energy. He worries constantly, is apprehensive and has feelings of hopelessness and helplessness. He has poor coping skills, gets frustrated quickly and consequently has trouble completing tasks or projects. He avoids going out in public, isolates himself socially and rarely leaves his home. As a result of his impairments, the claimant needs help with household tasks, outdoor chores, home maintenance and shopping.

> The severity of the claimant's condition is substantiated by numerous tests and examinations as well as observations and opinions from various medical sources. In this regard, in an Employability Assessment Form dated September 2, 2005, Michele Lea-Stokes, M.D., an examining psychiatrist, stated the claimant was permanently disabled. Similarly, in a Psychiatric Evaluation Report also dated September 2, 2005, Dr. Lea-Stokes stated that the claimant's global assessment of functioning score at that time was only 50. Lastly, in a Physical Medical Source Statement of Ability for Work-Related Activities Form dated December 2,2005, Brian D'Eramo, D.O., a treating physician, indicated the claimant was unable to sit, stand or walk for a total of 8 hours in an 8 hour workday.

(Tr. 55-56). This is a vastly different description of medical findings and

functioning than the evidence from 2010, 2011, and 2012.

From 2005 to 2007, the prior ALJ found that Plaintiff's "Hepatitis C, degenerative joint disease and left leg varicosities, require ongoing care accompanied with appropriate treatment by multiple medical specialists." (Tr. 55). In contrast, on May 7, 2009, Plaintiff followed-up for his Hepatitis C, and "denied any related complaints." (Tr. 284). In October of 2009, Plaintiff's treatment for varicose veins was switched to Johnston stockings, and there is no evidence of subsequent treatment modification. (Tr. 282). In 2010 and 2011, Plaintiff received only sporadic care without treatment by medical specialists for these problems and typically did not indicate subjective symptoms. His only treatment for these conditions in 2010 was a June 28, 2010 physical evaluation at the Pennsylvania Department of Corrections. (Tr. 192). His head, face, neck, scalp, nose, sinuses, mouth, throat, eyes, pupils, fundoscopy, heart, abdomen, endocrine system, genitalia, extremities, lymph nodes, feet, musculoskeletal system, skin, neurologic system, and mental status were all "normal." (Tr. 192). His only problems were dentures, diffuse wheezing, and varicose veins. (Tr. 192). Under remarks, the examiner noted "[h]ealthy male." (Tr. 193). When Plaintiff returned to prison in January of 2011, Plaintiff's intake form indicated that there were no referrals needed for his care and he was released to the general population. (Tr. 309). He requested a bottom bunk, but in March of 2011, his treating provider noted "does

not qualify for bottom bunk" and that he was "drug seeking and trying to manipulate for bottom bunk first said he needed it for his back and when that didn't work he said [']well I had vein stripping in my leg very bad['] – manipulation." (Tr. 317). Plaintiff submitted no medical evidence of these problems from 2012. This contrasts greatly with the period from 2005 to 2007, when he required "ongoing care accompanied with appropriate treatment by multiple medical specialists." (Tr. 55).

Evidence of his mental condition is also much more mild. From 2005 to 2007, his mental impairments "necessitate[d] close psychiatric monitoring and ongoing treatment with numerous psychotropic medications" and he had "mood swings, crying spells, increased irritability, restlessness, decreased appetite, memory problems and decreased motivation and energy… worries constantly, is apprehensive and has feelings of hopelessness and helplessness. He has poor coping skills, gets frustrated quickly and consequently has trouble completing tasks or projects. He avoids going out in public, isolates himself socially and rarely leaves his home."  (Tr. 55-56). However, during the relevant period, he did not treat with multiple psychotropic medications. He was on the same dose of Remeron, thirty milligrams a day, from January 1, 2009 throughout the relevant

period. (198-204, 297).[3] Medical records showed no observable symptoms on mental status examination at any time during 2010 or 2011. (Tr. 198-204, 297, 308, 313, 317-18). At times, Plaintiff reported feeling depressed, stressed, or upset, but memorialization of subjective complaints in medical records does not transform the subjective complaints into objective evidence. *See Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003) ("[T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements"). Plaintiff did not report any of the other symptoms present in 2007 at any point during the relevant period. (Tr. 198-204, 297, 308, 313, 317-18).

In the period relevant to the 2007 decision, two physicians opined that Plaintiff's mental impairments precluded work, and he was assessed a GAF of 50, which indicates serious symptoms.[4] (Tr. 32-33). In this case, no physician opined Plaintiff's mental impairments precluded work, the state agency physician opined Plaintiff could perform work despite his mental impairments, and he was assessed to have a GAF of 55, which denotes moderate symptoms, as opposed to his GAF

---

[3] Plaintiff testified to taking other psychotropic medications, but there is no medical evidence of any medication other than Remeron.

[4] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.") (citing *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994); *see also supra note 2*.

under the previous application of 50, which denotes serious symptoms.[5] (Tr. 298). Consequently, Plaintiff's receipt of benefits in 2007 does not mandate the award of benefits under the present application.

### b.    Factual errors by the ALJ

Plaintiff asserts that the ALJ made factual errors in his decision. However, even assuming they were errors, they do not affect the outcome of the decision. First, Plaintiff asserts that it was an error to conclude that he was discharged without medication when he was paroled in August of 2010, and that he had been taking medication for years. (Tr. 174). However, even assuming he was discharged with his medications, these medications would still only be the same stable dose of Remeron/Elavil and over-the-counter pain medications that were present throughout the record. This constitutes conservative treatment and indicates that his conditions are not disabling. SSR 96-7p.

Plaintiff asserts that the ALJ mischaracterized his testimony regarding twisting his back, and that what he actually said was that a doctor found that his back was twisted, and that was causing his pain. (Tr. 174). However, the ALJ properly found Plaintiff's subjective claims to be not credible, and Plaintiff did not submit any objective evidence of a twisted back. Regardless, the ALJ found that Plaintiff had an impairment that could reasonably be expected to produce his back

---

[5] *Supra.*

pain. (Tr. 16-18). However, the ALJ found that Plaintiff's back pain was not disabling. Whether this was due to Plaintiff "twisting" his back or due to a back that was "twisted" is irrelevant. (Tr. 15-18). Plaintiff also asserts that this twisted back precludes him from sitting for a long period of time. (Tr. 170). However, the ALJ limited him to positions that only required up to two hours of sitting in an eight-hour workday and afforded him the opportunity to sit and stand at will. Plaintiff has not identified any reason to conclude that this limitation does not account for his back pain. The Court also notes that in the 2007 ALJ decision, on which Plaintiff extensively relies, the ALJ found that Plaintiff would be able to sit for six hours out of an eight-hour workday.

### c. Plaintiff's RFC

Plaintiff asserts that the ALJ did not properly evaluate the limitations arising from his diagnoses. Plaintiff did not submit any medical opinion evidence to support his claims and only produced limited objective medical evidence. Thus, the ALJ had to make a credibility determination. When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity,

persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)).

Plaintiff asserts that his Hepatitis C makes him "tired and lacking energy to do things" and causes him to "sleep a great deal." (Tr. 170). In Plaintiff's Appeal Brief, he copies the language from the 2007 decision that his Hepatitis C "requires ongoing care accompanied with appropriate treatment by multiple medical specialists." (Pl. Brief at 6). However, in May of 2009, Plaintiff followed-up for hepatitis C, and specifically denied any related complaints. (Tr. 284). There is no mention of fatigue due to hepatitis C in records from 2010, 2011, and 2012. As the ALJ noted, "the record reflects no … current treatment for hepatitis C." (Tr. 17).

Similarly, he alleges his Elavil causes side effects of drowsiness. (Tr. 170). In January of 2010, Plaintiff reported that he was compliant with his psychiatric medications and had no side effects. (Tr. 201). There is also no medical evidence of him being prescribed Elavil during the relevant period. After his evaluation at

Wellspan in December of 2010, he was prescribed Remeron. (Tr. 298). At his intake when he returned to prison in January of 2011, he indicated that his only medications were Remeron, which he had taken the night before. (Tr. 307). On February 4, 2011, he did not mention depression or mental impairments and was prescribed Zantac and albuterol. (Tr. 318). As of March 7, 2011, his medications included Hytrin, Naprosyn, albuterol, and Zantac. (Tr. 304). There is no subsequent medical evidence before the Court.

Plaintiff asserts that he is disabled because his asthma requires the use of inhalers every day. (Tr. 170). However, use of inhalers does not preclude employment. Moreover, the medical evidence from Plaintiff's providers shows that he had only "mild" or "moderate" asthma throughout his incarceration after 2007. (Tr. 283, 286, 277). As the ALJ noted:

> Chest X-rays of the claimant taken in August 2006 and June 2008 were found to be normal (Exhibit B2F). During examination on August 13, 2008, the record notes that within the past 72 hours of this examination the claimant has not had any symptoms of shortness of breath, wheezing, coughing, night sweats or spitting up blood. Examination of the claimant in March 2010 evidences shortness of breath (Exhibit B2F). However, the record from a follow up examination in June 2010 notes no recent respiratory infection and no uncontrolled asthma (Exhibit B2F). Further, results from an examination of the claimant in January 2011 note that the claimant's lungs are clear and that his heart is normal in size (Exhibit B4F). Notes from an examination of the claimant in February 2011 indicate that the claimant's breathing sounds are equal and there is no diminished breath (Exhibit B4F). The record notes that the claimant conservatively treated his asthma in 2008 and only with a corticosteroid inhaler as needed (Exhibit B2F). Lastly, the record

notes that the claimant is a smoker and the record indicates that the claimant's asthma is relatively well-controlled when he takes his breathing medications. (Exhibits B2F, B4F).

(Tr. 17). Thus, the ALJ relied on Plaintiff's objective medical evidence and conservative treatment to conclude that his asthma complaints are not disabling. This is an accurate characterization of the record and a proper basis to reject his credibility.

Plaintiff asserts that he has degenerative joint disease in his fingers, which makes it hard to push or pull things or hold anything for any length of time. (Tr. 170). However, the ALJ limited the use of his bilateral hands to only occasionally, and Plaintiff has not identified any reason to conclude that this limitation does not adequately account for his complaints of hand pain. (Tr. 15). Moreover, the record only has passing reference to problems with his hands. In June and August of 2008, he reported arthritis in his hands. (Tr. 180, 291). There are no other medical records indicating complaints of arthritis in his hands.

Plaintiff asserts that he has a left shoulder dislocation, which prevents him from lifting his arm high. (Tr. 170). However, the ALJ limited him to only occasionally reaching with his left arm. (Tr. 15). Plaintiff does not explain how this limitation is inadequate. Moreover, beyond Plaintiff's complaints of limited range of motion, there is no objective evidence of a shoulder impairment. The 2007 ALJ decision does not reference shoulder limitations. Similarly, Plaintiff asserts that

bilateral knee pain precludes him from kneeling. Again, the only evidence of a knee impairment is Plaintiff's subjective complaints, and the 2007 ALJ decision does not mention kneeling limitations. (Tr. 55).

In Plaintiff's brief, he further asserted that his degenerative joint disease "requires constant consumption of pain relieving medications as well as anti-inflammatory's with the same side effects stated above," that his bilateral knee arthritis "forces Claimant to use a cane while mobile and causes the same symptoms as [degenerative joint disease]," and that his shoulder dislocation prevents him from lifting or carrying more than ten pounds. (Pl. Brief at 6). Plaintiff asserts that his degenerative disc disorder causes pain sitting, standing, lifting, carrying, pushing, pulling, bending, crouching, and kneeling, and that his back pain "requires ongoing treatment as well as consumption of pain relieving narcotics and the side effects of such narcotics and the side effects of such medications disqualify Claimant from operating machinery and hinders Claimant's concentration." (Pl. Brief at 6).

The ALJ sufficiently addressed these claims in the decision. He specifically explained that "the record from examination in January of 2008 evidences that the claimant's gait is coordinated and his hand grip is "firm." The record from examination of the claimant in February of 2011 indicates that the claimant has no

edema in his legs and that he is able to bring his hands to mid shin area." (Tr. 17).

The ALJ continued:

> Regarding treatments, during examination in August 2008, the record notes that the claimant does not need orthotics, braces, crutches, cane or a wheel chair to ambulate (Exhibit B2F). Further, the record indicates that the claimant conservatively treats his DDD, DJD, left shoulder impairment, and arthritis with only Tylenol and NSAIDS, The record evidences that the claimant has not had any physical therapy, surgical procedures, or restricted in his movements by his treating physician. In addition, the record from a physical examination of the claimant in June 2010 remarks a "healthy male" (Exhibit B2F) and the record from examination in February 2011 indicates that the use of NSAIDS makes his pain better (Exhibit B4F).

(Tr. 17). Thus, the ALJ relied on the objective medical evidence and conservative treatment to reject Plaintiff's claims regarding his back pain, shoulder pain, knee pain, and hand pain. This is an accurate characterization of the record and a proper basis to reject Plaintiff's credibility. SSR 96-7p.[6] Contrary to Plaintiff's claims, there is no evidence that he treated his pain with narcotics during the relevant period. *Supra*. There is also no medical evidence that Plaintiff uses a cane or that he experiences side effects from medication.

Plaintiff asserts that his varicose veins preclude him from "stand[ing] for any long period of time, which causes [him] to lie down" due to swelling. (Tr. 170) (Pl. Brief at 6). However, Plaintiff testified that swelling from varicose veins only

---

[6] Regardless, the position identified by the VE and the ALJ, a conveyor line bakery worker, does not require kneeling. 524.687-022 BAKERY WORKER, CONVEYOR LINE, DICOT 524.687-022 ("Kneeling: Not Present - Activity or condition does not exist").

returns when he does not wear the stockings prescribed to him. (Tr. 35). Moreover, his treating providers specifically stated that he was being manipulative with regard to his varicose vein complaints because he wanted to get a bottom bunk. They noted "does not qualify for bottom bunk" and that he was "drug seeking and trying to manipulate for bottom bunk first said he needed it for his back and when that didn't work he said ['']well I had vein stripping in my leg very bad['] – manipulation." (Tr. 317). As the ALJ notes, beyond the Jobst stocking, "the record reflects no actual treatment for pain stemming from his varicose veins since his surgery." (Tr. 17). This is an accurate characterization of the record and a proper basis to reject his credibility. (Tr. 17).

Plaintiff copies the language from the 2007 ALJ decision and argues that his mental impairments cause "mood swings, crying spells, increased irritability, restlessness, decreased appetite, memory problems, and decreased motivation" and that he "regularly sees a psychiatrist and has ongoing treatment with numerous psychotropic medications." (Pl. Brief at 6). As a result, Plaintiff contends that his concentration should have been reduced to 80% instead of 90%. (Pl. Brief at 7). As discussed above, however, while there may have been evidence of these symptoms and treatment in 2007, there is no evidence that they persisted in 2010, 2011, or 2012. With regard to Plaintiff's mental health, the ALJ wrote:

> The record from examination of the claimant in January 2008 evidences no ideation of suicide, with appropriate affect, and alert and

oriented to person, place, and time. The record from this examination notes that the claimant reports no medical complaints (Exhibit B2F). During psychiatric evaluation in August 2008, the claimant was noted to be oriented to time, place, and person; and does not have thoughts of suicide or evidence of self-mutilation (Exhibit B2F). The record from this examination notes that the claimant has appropriate affect, normal mood, and normal thought content. The record from this examination also notes that the claimant has intact memory, intact insight, intact judgment, intact attention and concentration ,and has an adequate funds of knowledge (Exhibit B2F). The record from follow up mental health examinations of the claimant in April and August 2009, January and August 2010, and March and November 2011 note that the claimant has good appearance and hygiene; is oriented to person. place, and time; has goal directed thought processes; no delusions; and no perceptual disturbances. These examinations further reveal that the claimant has fair judgment, fair insight and euthymic mood (Exhibit B2F). The claimant conservatively treats his depression with prescription medication while incarcerated, but was discharged without medications (Exhibits B2F, B3F; Testimony). During a mental status examination in December 2010, Gary B. Zimberg, M.D., noted that the claimant is currently not prescribed any medications (Exhibit B3F). Further, the claimant's symptoms and functioning, expressed throughout the record as Global Assessment of Functioning (GAF) scores by the claimant's mental health providers ranged from 55 to 70. These GAF scores are from 2008 through December 2010 (Exhibits B2F, B3F).

(Tr. 18). Thus, the ALJ considered the objective medical evidence and Plaintiff's conservative treatment. This is an accurate characterization of the record and an appropriate basis to reject Plaintiff's credibility. SSR 96-7p.

With regard to Plaintiff's credibility generally, the ALJ wrote:

The undersigned finds that the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment for several other reasons, in accordance with Social Security Ruling 96-7p. Despite the claimant's

allegations, he is admittedly able to provide care for himself, prepare meals, complete household chores, drive, shop, and does not require ambulatory aides or braces to accomplish tasks (Exhibit B3E). Upon examination, the claimant's gait was normal and his hand grip is firm. (Exhibit BIF). The claimant conservatively treats for his DDD, DJD, knee impairment, and arthritis with NSAIDS (Exhibits BIF, B2F, B3 F, B4F) and the record contains little evidence that the claimant currently treat for his asthma, hepatitis, varicose veins, or his depression. Despite the claimant's mental health impairment, the claimant is able to read, focus to speak in front of his counseling meetings, and perform his activities of daily living (Exhibit B3E). These admitted abilities provide support, in part, for the residual functional capacity found by the undersigned and are quite inconsistent with the claimant's allegations of totally debilitating symptoms and limitations. It is also noteworthy that the claimant has required conservative care for his symptoms and there is no indication that a treating or examining source is alarmed by the claimant's presentation. The claimant has not required acute psychiatric treatment and treats with medication compliance (Exhibit B2F, B3F).

(Tr. 18). This is an accurate characterization of the record and the rationales are appropriate bases to reject Plaintiff's credibility. SSR 96-7p. Finally, the ALJ relied on a medical opinion with regard to Plaintiff's mental impairments:

Exhibit B2A contains an opinion and report of the State agency psychological consultant, who assessed the claimant's depression as not severe, with only a mild degree of limitation in his activities of daily living; mild degree of limitation in maintaining social functioning; moderate degree of limitation in maintaining concentration, persistence or pace and no repeated episodes of decompensation. This State agency psychological consultant found that the claimant is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his mental impairment (Exhibit B2A). The opinion and report of this consultant are generally consistent with and supported by the record as a whole in that the record demonstrates that the claimant's depression is controlled with medication, that he had no psychiatric hospitalization, no therapy, and has had no manic episodes (Exhibits

BIF, B2F, B3F). The record also evidences the claimant was alert, active with normal mood and affect (Exhibit B2F). Therefore, the undersigned affords this opinion and report significant weight.

(Tr. 19). This is an uncontradicted medical opinion that supports the ALJ's RFC.

An uncontradicted medical opinion that supports an ALJ's RFC generally provides substantial evidence to the ALJ's conclusions. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *Michaels v. Colvin*, CIV.A. 12-1181, 2013 WL 2353977, at *7 (W.D. Pa. May 29, 2013) ("Given that Dr. Schiller's opinion was uncontradicted, it was clearly sufficient to support the ALJ's conclusion relating to Michaels' anxiety."); (citing *Brown v. Astrue*, 649 F.3d 193, 196–197 (3d Cir.2011); *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir.1991)).

In Plaintiff's appeal brief, he contends that the ALJ considered his impairments individually, instead of in combination. (Pl. Brief at 4). However, the ALJ specifically evaluated his severe impairments at step two "in combination" to conclude that they lasted the requisite twelve months. (Tr. 12). At step three, the ALJ specifically evaluated whether he had "an impairment or combination of impairments" that meets or equals a Listing. (Tr. 12). The ALJ specifically included limitations caused by a combination of impairments in the RFC, as he noted that "[d]ue to fatigue, pain, side effects of medication and mental health conditions, the claimant's attention and concentration must be expected to be reduced to 90%." (Tr. 15-16). Thus, the ALJ considered Plaintiff's impairments in

combination.

In Plaintiff's complaint, he alleges that the ALJ violated 20 C.F.R. 416.912(d), which requires the ALJ to develop a complete medical history for at least twelve months preceding the month in which the application was filed by obtaining records from his medical sources. Doc. 1. However, Plaintiff has not identified any medical records that were not obtained by the ALJ, and the ALJ thoroughly discussed records dating back to 2008, even though Plaintiff's benefits terminated in 2009 and he did not refile his application until August 25, 2010 at the earliest. (Tr. 12-20).

Plaintiff also asserts in the complaint that he would not be employable in a recessed economy. Doc. 1. Similarly, in Plaintiff's brief, he notes that he would not be able to find a job because there are social and economic difficulties that prevent even able-bodied men from finding a job. (Pl. Brief at 9). However, neither the national economy nor Plaintiff's chances of actually obtaining a job are relevant to determining whether he is unable to work due to a disability. *See* 42 U.S.C.A. § 1382c(a)(3)(B). (Disability must be determined "regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.") Thus, the Court finds no merit to this, or any other, of Plaintiff's allegation of error.

The Act requires Plaintiff to produce medical evidence of his impairments,

and there is no exception in this requirement for incarcerated claimants:

> (5)(A) An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C.A. § 423(d) (West). Plaintiff has not produced the requisite medical evidence, and the ALJ decision is supported by an uncontradicted medical opinion. Thus, the Court finds no merit to Plaintiff's allegations of error.

Again, the Court emphasizes to Plaintiff that, even if benefits were awarded, he will not be entitled to his requested relief that "SSI benefits…be immediately reestablished when [he] is released from incarceration as well as receiving a retroactive payment as well." (Pl. Brief at 4). Plaintiff's benefits under this application terminated in February of 2012, once he was incarcerated for more than twelve months, and regardless of the outcome of this appeal, he will have to apply for benefits again once he is released. *Supra.*

## VIII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28

U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: August 26, 2015                          _____s/Gerald B. Cohn_____

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE